**BROWNING OIL COMPANY, INC. and Marathon Oil Company, Appellants,**

v.

**Jimmie M. LUECKE and Leona M. Luecke, Appellees.**

No. 03–98–00638–CV.

Court of Appeals of Texas, Austin.

Nov. 9, 2000.

---

Michael E. McElroy, McElroy, Sullivan, Ryan & Miller, Austin, Claudia Wilson Frost, Slusser & Frost, L.L.P., Houston, for appellants.

David W. Nelson, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, for appellees.

Before Chief Justice ABOUSSIE, Justices KIDD and B.A. SMITH.

## ON MOTION FOR REHEARING

BEA ANN SMITH, Justice.

We withdraw our opinion and judgment of September 21, 2000, and substitute the following opinion.

This dispute concerns pooled units for the horizontal drilling of oil and gas. At issue is: (1) whether Lessees[1] improperly formed pooled units for two successful horizontal wells in violation of anti-dilution restrictions in the pooling provisions of the leases, and if so, (2) what remedy Lessors[2] are entitled to. The trial court determined that Lessees violated the pooling provisions in the leases, rendering the pooled units invalid. The trial court then submitted the question of damages for this breach to a jury; based on the jury's verdict, the trial court awarded Lessors $833,256, plus pre- and post-judgment interest and attorneys' fees.

We affirm the trial court's determination that Lessees breached the pooling provisions of the leases. Because the breach rendered the pooled units invalid, we hold that Lessors are not entitled to receive royalties on oil and gas recovered from another's land. We note the physical characteristics that distinguish horizontal wells from vertical wells: Horizontal wells tra-verse several tracts owned by different individuals, not all of which are contiguous; they include multiple points along the drainhole rather than a single drillsite; and they penetrate highly fractured formations that do not facilitate the natural migration of oil and gas. Because of these physical distinctions, the remedy for invalid pooling appropriate to vertical wells is inappropriate to horizontal wells. We hold that the trial court's charge to the jury was fatally defective for failing to guide the jury to award damages on proper grounds and correct principles of law. We remand to the trial court for a determination of the Lessors' remedies under the leases. Finally, we hold the trial court did not err by striking Browning's counterclaim.

## BACKGROUND

Before assessing the propriety of the trial court's judgment, we will review certain oil and gas concepts pertinent to our analysis.

### The Rule of Capture

The rule of capture is an ancient doctrine in oil and gas law that serves as a basis for many statutory and regulatory provisions. *See* 1 Ernest E. Smith & Jacqueline Lang Weaver, *Texas Law of Oil and Gas* § 1.1 (Michie 1996). Recognizing that oil and gas are fugaceous minerals that will migrate without regard to property lines, the rule provides that a landowner owns all the oil and gas produced by a well drilled on her land, even though the well may be draining minerals from nearby properties. *See Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 561–62 (1948). Owners of tracts of land with producing wells may thus drain and appropriate the oil and gas that have flowed from neighboring tracts without the consent of the owner of those lands and without incurring liability for drainage. *See id.* at

---

1. We will refer to appellants Browning Oil Company, Inc. (Browning) and Marathon Oil Company (Marathon) collectively as Lessees, unless our analysis requires us to distinguish between the two parties.

2. Appellees Jimmie M. Luecke and Leona M. Luecke will be referred to as Lessors or the Lueckes.

562. A neighboring landowner's only recourse is to drill another well on the adjacent property to capture as much oil and gas as possible. Hence, a natural consequence of the rule of capture is overdrilling, resulting in physical and economic waste.[3] *See* Taylor Reid & John W. Morrison, *Doing the Lateral Lambada: Negotiating the Technical and Legal Challenges of Horizontal Drilling,* 43 Rocky Mtn. Min. L. Inst. § 16.05[2] (1997).

## Railroad Commission Regulations

By controlling the location of wells and limiting their production, the Railroad Commission of Texas has played an important role in diminishing the rule of capture, preventing waste, and protecting correlative rights.[4] *See* 1 Smith & Weaver, *supra,* § 1.1. By promulgating regulations and field rules[5] that govern well spacing, well density, and well production, the Commission has reduced the likelihood of drainage between tracts and diminished the applicability of the rule of capture. *See* 1 *id.*

### 1. *Spacing Requirements*

Spacing requirements were adopted for the purpose of limiting the number of wells and locating the wells in particular positions to maximize recovery of a field. *See* 2 *id.* § 8.2. The rules prescribe minimum distances between a proposed well and any other well drilled in the same area and between the proposed well and property lines. *See* 16 Tex.Admin.Code § 3.37 (2000). For example, the applicable field rules for the Giddings (Austin Chalk 3) Field, the field in which the Lueckes' land is located, specify that oil wells drilled to the same reservoir must be at least 1200 feet apart and at least 467 feet from any property line, lease line, or subdivision line. *See* Tex.R.R. Comm'n, *Final Order Restating and Amending the Field Rules for the Giddings (Austin Chalk 3) Field, Lee, Fayette, Burleson, Brazos and Madison Counties, Texas,* Docket No. 3–98,177 (Sept. 28, 1992) (*Giddings (Austin Chalk 3) Field Rules*). Acreage is assigned to the well in accordance with the spacing regulations to form a drilling unit, which must be designated *before* a well may be drilled. *See* 2 Smith & Weaver, *supra,* § 10.1.

### 2. *Density Requirements*

Closely tied to well spacing rules are density regulations. Density rules require the assignment of a specified number of acres to a well *after* it has been drilled, creating a proration unit. *See* 2 *id.* The purpose of the density rules is to establish the acreage that wells in a specific field can drain efficiently. *See* 2 *id.* § 10.2. Factors such as the permeability and porosity[6] of the reservoir rock are

**3.** Physical waste generally refers to the unnecessary flaring, evaporation, or other surface loss of oil and gas or production practices that reduce or tend to reduce the total ultimate recovery of oil or gas from any pool. *See* Tex.Nat.Res.Code Ann. § 85.046 (West Supp.2000); *see also* 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* 789 (1999). Economic waste refers to the drilling of unnecessary wells and production in excess of reasonable market demand. *See* 2 Ernest E. Smith & Jacqueline Lang Weaver, *Texas Law of Oil and Gas* § 8.3 (Michie 1996).

**4.** Correlative rights afford each landowner the reasonable "opportunity to produce his *fair share* of the recoverable oil and gas beneath his land." *See Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 562 (1948) (emphasis added). But this right is qualified: in exercising their right to a fair share of production, landowners must submit to such limitations as are necessary to enable each owner to get his own fair share of the minerals. *See id.* They have a duty "not to exercise [their] privileges of taking so as to injure the common source of supply." *Id.* at 563.

**5.** Field rules are special rules that modify the Railroad Commission's well spacing, density, prorationing, and casing requirements for designated fields to deal with differences in reservoir conditions. *See* 2 Smith & Weaver, *supra,* § 10.2; Robert E. Hardwicke, *Oil Well Spacing Regulations and Protection of Property Rights in Texas,* 31 Tex.L.Rev. 103 (1952).

**6.** Porosity "measures the capacity of the rock to hold oil, gas, and water." Williams & Meyers, *supra,* at 806. Permeability is the

used to determine the drainage area in creating the density requirements for a particular field. *See* Tex. Nat. Res.Code Ann. § 86.089(c) (West 1993). Although drilling permits do not apply to proration units, an operator generally cannot drill a well on less acreage than that required by the density regulations. *See* 2 Smith & Weaver, *supra*, § 9.3.

### 3. *Production Allowables*

■ Production allowables refer to the maximum amount of hydrocarbons a well may recover as prescribed by the applicable field rules. Production allowables are designed to limit production from a well in order to control the rate of production from the field. *See* 1 *id.* § 1.1. In the Giddings (Austin Chalk 3) Field, the field rules allocate production on the basis of productive surface acres. *See Giddings (Austin Chalk 3) Field Rules.* Thus, an operator must first designate the proration unit and the acreage assigned to it, then certify that the acreage is productive before receiving the well's production allowable. *See* 2 Smith & Weaver, *supra*, § 10.1.

### Pooled Units

■ Often, if a tract is of insufficient size to satisfy the state's spacing or density requirements, lessees will "pool" acreage from different leased tracts.[7] Pooling allows a lessee to join land from two or more leases into a single unit. *See* 2 *id.* Operations anywhere within the unit are treated as if they occurred on all the land within the unit, and production from a well on the pooled unit is treated as occurring on all the tracts pooled into the unit. *See Southland Royalty Co. v. Humble Oil & Refining Co.,* 151 Tex. 324, 249 S.W.2d 914, 916 (1952). With regard to the royal-

ty interest owners, pooling results in "a cross-conveyance of interests in land by agreement among the participating parties, each of whom obtains an undivided joint ownership in the royalty earned from the land in the 'block' created by the agreement. Royalty is distributed on the basis of the proportion each party's acreage bears to the whole block." *MCZ, Inc. v. Triolo,* 708 S.W.2d 49, 52–53 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (citing *Brown v. Smith,* 141 Tex. 425, 174 S.W.2d 43, 46 (1943)). Effective pooling in essence abrogates the rule of capture by allowing owners of non-producing tracts to share in production from the producing tract. A lessee's authority to pool is derived solely from the terms of the lease; a lessee has no power to pool absent express authority. *See Southeastern Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 170 (Tex.1999); *Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1965).

### Horizontal Wells

This dispute requires us to consider the applicability of these traditional oil and gas concepts to horizontal wells. Horizontal wells are initially drilled vertically, and then at a pre-determined point, the drillstem deviates and proceeds horizontally into the targeted formation. *See* Patricia A. Moore, *Horizontal Drilling—New Technology Bringing New Legal and Regulatory Challenges,* 36 Rocky Mtn. Min. L. Inst. § 15.01[1] (1990). A wellbore can extend across several acres and several leased tracts, increasing the likelihood of recovery of minerals. Each tract traversed by the horizontal wellbore is a drillsite tract, and each production point on the wellbore is a drillsite.

---

measure of how readily fluid flows through the rock. *See id.* at 775.

**7.** Although pooled units are often formed to satisfy spacing requirements, the grant of a permit to drill a well does not result in the valid pooling of the separately owned interests within the drilling unit. Similarly, the

designation of a proration unit does not have the effect of creating a pooled unit. The Railroad Commission has no authority to determine property rights. *See Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1965); 2 Smith & Weaver, *supra,* § 10.1.

Horizontal drilling has revived drilling in highly fractured areas[8] by reducing the risks associated with vertical drilling:

> Operators have discovered that drilling a wellbore horizontally ... provides the opportunity to expose more of the productive zone for more efficient capture of this elusive [oil and gas] natural resource. What truly seems phenomenal is that this technology is reviving areas that were once thought to be nearly depleted of oil and gas. Its most effective utilization to date has been in reservoirs that are highly fractured. Here, the drilling of vertical wells has always been extremely risky, being dependent upon the chance of actually drilling into such an oil-bearing fracture or gaining access to a nearby fracture through various completion techniques.
>
> .... It is a known fact that a horizontal well recovers hydrocarbons from the reservoir much more efficiently and effectively than does a conventional [vertical] hole. It also takes fewer of them.
>
> .... It promotes the drilling of fewer wells (preventing waste) and it realizes the more efficient and economical recoveries of this nation's reserves.

*Id.* §§ 15.01, .04, .05. Horizontal wells have been said to recover anywhere from two to five times the hydrocarbons of a vertical well; however, they can also require two to three times the investment. *See id.* § 15.03[1]; Reid & Morrison, *supra*, § 16.02. In order to offset this increased cost, the wells must significantly augment production. *See* Reid & Morrison, *supra*, § 16.02. Thus, an operator derives economic benefit by increasing the length of the lateral wellbore to improve the chances of penetrating additional producing fractures. *See id.*

The Austin Chalk formation is a highly fractured area where horizontal drilling has proved successful. According to the undisputed evidence in the record, this formation has relatively low porosity and very low permeability, rendering potential recovery of minerals from the subsurface rock improbable. The most likely source of production in this formation is the recovery of hydrocarbons trapped in the gaps created by the fractures. The gaps are positioned primarily side by side rather than on top of one another. A horizontal drainhole can extend through multiple gaps, thereby enhancing the recovery of minerals. *See id.* § 16.04[1].

The Railroad Commission refers to a "horizontal drainhole well" as any well that consists of one or more horizontal drainholes. *See* 16 Tex.Admin.Code § 3.86(a)(4) (2000). A horizontal drainhole is that part of the wellbore that deviates at more or less of a right angle from the vertical wellbore; it begins at the penetration point, where it penetrates the field at an interval capable of production, and ends at the terminus point, the point farthest from the penetration point but within the producing interval. *See id.* § 3.86(a)(2), (5), (6) (2000). For purposes of designating a proration unit and allocating production allowables, units are determined by the length of the horizontal displacement between the penetration point and the terminus point, *i.e.*, the horizontal displacement of the drainhole. *See Giddings (Austin Chalk–3) Field Rules.* The displacement of the drainhole must extend at least 100 feet for the well to be classified as a horizontal drainhole. *See* 16 Tex.Admin.Code § 3 .86(a)(4).

---

**8.** Fractures result from geological shifting and sliding of the land over time. *See* Taylor Reid & John W. Morrison, *Doing the Lateral Lambada: Negotiating the Technical and Legal Challenges of Horizontal Drilling*, 43 Rocky Mtn. Min. L. Inst. § 16.04[1] (1997). The fractures create gaps in the rock formation that can trap hydrocarbons. *See id.* Due to the overburden and in-situ stresses in the reservoir, these fractures are often aligned in one direction, allowing horizontal wells to intersect multiple "gaps" when drilled perpendicular to the plane of fracturing. *See id.*

■ Proration units for vertical wells are unaffected by the depth of a vertical wellbore.[9] By contrast, the length or displacement of a horizontal drainhole controls the maximum acreage that may be assigned to its proration unit: the longer the horizontal drainhole, the more acreage assigned to the unit. It is not uncommon for horizontal drainholes to extend up to 5000 feet. *See* Moore, *supra,* § 15.02[1]. Although the field rules for the Giddings (Austin Chalk 3) Field provide a formula[10] to determine the maximum acreage that may be assigned to each proration unit for horizontal wells, they allow the operator to use a lesser amount. *See Giddings (Austin Chalk 3) Field Rules.* The only caveat is that all points on the drainhole must be included within the proration and drilling units. *See id.;* 16 Tex.Admin.Code § 3.86(d)(4) (2000).

**9.** A vertical well may recover hydrocarbons from multiple depths; however, the depth of the well will not extend the size of the proration unit.

**10.** The formula is as follows:

$$A = (L \times 0.11488) \text{ acres} \gg 160 \text{ acres}$$

"A" is the acreage that may be assigned to each horizontal drainhole well unit, and "L" is the horizontal displacement of the drainhole in feet. Tex.R.R. Comm'n, *Final Order Restating and Amending the Field Rules for the Giddings (Austin Chalk–3) Field, Lee, Fayette, Burleson, Brazos and Madison Counties, Texas,* Docket No. 3–98,177 (Sept. 28, 1992). Horizontal displacement is calculated from the penetration point of the drainhole to the terminus. *See* 16 Tex.Admin.Code § 3.86(a)(3). Application of the formula allows an unlimited amount of acreage to attach to the unit, depending upon the horizontal displacement of the drainhole.

**11.** In 1994, Browning and Marathon entered into an operating agreement with regard to development in the Giddings (Austin Chalk 3) Field, which includes the Lueckes' acreage under the leases.

**12.** Tract one consists of 150 acres. Tract two covers 88.12 acres, and tract three covers 193.735 acres.

**13.** Jimmie and Leona Luecke each own fifty percent of the minerals under tract one. Jimmie owns seventy-five percent of the minerals

## The Dispute

In 1979, the Lueckes executed three oil and gas leases with Humble Exploration Company, Inc., which later assigned its interest to Browning.[11] The leases cover three tracts of land in Fayette County.[12] Jimmie Luecke and his mother Leona Luecke collectively own one hundred percent of the minerals under tracts one and three, and Jimmie owns fifty percent of the minerals under tract two.[13] Except for the property descriptions, the operative provisions in the leases are identical. Under the terms of the leases, the Lueckes are entitled to a one-eighth royalty on production from the minerals they own on each of the tracts.[14]

The original 1979 leases include pooling provisions, authorizing Lessees to pool the Lueckes' land subject to certain limitations. The pooling provisions allocate to

under tract three, and Leona owns the remainder. A non-party to this suit owns the remaining fifty percent of the minerals underlying tract two.

**14.** The royalty provision in the leases provides in relevant part:

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipelines to which the wells may be connected; ... (b) to pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, one-eighth of the amount realized from the sale of gasoline or other products extracted therefrom and one-eighth of the amount realized from the sale of residue gas after deducting the amount used for plant fuel and/or compression; ... and (c) on all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election....

Because Jimmie owns only half of the mineral rights in tract two, Jimmie is entitled to a one-sixteenth royalty (half of the one-eighth royalty) in that tract. Jimmie and Leona together are entitled to the entire one-eighth royalty for all production from tracts one and three.

each tract covered by a valid pooled unit a pro rata share of production based on the surface acreage that each contributes to the pooled unit:

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with any other land covered by this lease, and/or with any other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated.... For the purposes of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit ... a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis—that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit ... that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease ... and included in the pooled unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land.

The leases also include an anti-dilution provision, which provides that a pooled unit must include at least sixty percent of the acreage from the tract on which the well is drilled:

14. Notwithstanding paragraph number four (4) hereof, if any pooled unit is created with respect to any well drilled on the land covered hereby, at least

sixty percent (60%) of such pooled unit shall consist of the land covered hereby.

The provision is intended to ensure that the Lueckes' share of royalties in production from any well drilled on their land is not diluted by including only a small portion of their land in a large pooled unit.

In 1984, paragraph fourteen was amended to provide that if a pooled unit is too large for the covered tract to constitute sixty percent of the unit, the unit must be filled "only [with] other lessor owned land"—that is, exclusively with other land owned by the Lueckes—until the adjacent Luecke-owned land is exhausted. A third provision allows Lessees to include non-Luecke land in the pooled units only to the extent necessary to satisfy the Railroad Commission field rules. And a final provision requires that if the applicable Railroad Commission field rules offer a choice between spacing requirements of different sizes, Lessees must choose the "lesser" one—that is, the one that permits smaller units to be formed, minimizing the chance that any unit will ever need to include non-Luecke land to satisfy the spacing rules:

In the event a well is drilled on a tract of insufficient size to contribute sixty percent (60%) of the unit acreage, Lessee will pool all of the drillsite leased acreage and when available, will pool only acreage from other Lessor owned land under lease to Lessee, provided however, that Lessee may pool other acreage not owned by Lessor if required to meet established field rules. In this event, only that acreage necessary to make the unit meet the applicable field rules will be included.

In the event that Lessee shall have an option to utilize a greater or lesser spacing requirement with respect to any producing well and or producing formation or horizon, then Lessee affirmatively covenants and agrees to utilize the lesser spacing requirement. For example, in the event that the field rules specify that in connection with the production from the Chalk Formation, the Lessee

may utilize either a One Hundred Sixty (160) acre spacing requirement and/or an optional Eighty (80) acre spacing requirement, then Lessee shall utilize the lesser Eighty (80) acre spacing requirement.[15]

(Footnote added.) Although the parties executed the leases and amendments prior to the surge of horizontal drilling and likely did not contemplate the possibility of horizontal wells, no language specifically limits the applicability of the anti-dilution provisions to vertical wells.

Recognizing the benefits of horizontal drilling in the Austin Chalk formation, a representative from Marathon sent a letter to the Lueckes on November 2, 1994 seeking to amend the leases "to clarify" the pooling authority for horizontal wells.[16] In effect, the proposed amendment would have nullified the anti-dilution provisions, allowing Lessees the sole discretion to pool any portion of the Lueckes' land to create a unit with a horizontal well utilizing the *greatest* acreage allowable:

> In addition to the provisions for pooling, combining or unitizing as contained in Paragraph 4 of the Lease, in the event Lessee, its successors or assigns, should exercise its right and power, *in its sole option and discretion*, to pool, unitize or combine the lease premises or any portion thereof with other lands in order to form a unit or pooled unit containing a well with a horizontal drainhole, as defined herein, such unit or pooled unit may, *within the discretion of Lessee*, its successors or assigns, contain the *greatest acreage allowable* to the extent prescribed or permitted by the Railroad Commission of Texas or other governmental authority having jurisdiction, including, without limitation, Statewide Rule 86 ... and any amendments or

supplements thereto.... For the purposes of the lease and for the purpose of exercising the above described rights, a horizontal well or horizontal drainhole is defined as any well in which the horizontal component of the gross completion interval is, at a minimum, one hundred (100) feet.

(Emphasis added.) The Lueckes refused to execute the proposed amendment.

Nevertheless, on February 13, 1995 Lessees completed the first of two horizontal wells that traverse the Lueckes' land. The Jennifer Medusa Well No. 1 is a horizontal well that crosses seven separate tracts of land, only one of which belongs to the Lueckes. The vertical portion of the well and a part of the horizontal drainhole are physically located on the Lueckes' tract two. According to the Certificate of Pooling Authority[17] filed by Lessees with the Railroad Commission, the well was drilled on a purported pooled unit consisting of 839.18 acres, 268.68 of which are owned by the Lueckes—115.82 acres from tract one, 87.68 acres from tract two, and 65.18 acres from tract three—accounting for thirty-two percent of the entire purported unit. The balance of the unit is filled out by non-Luecke acreage. Tract two, the only Luecke tract traversed by the well, comprises 10.44 percent of the total purported unit, far less than the sixty percent specified in the anti-dilution provisions.

On February 18, 1995, Lessees drilled a second horizontal well, the Weyand–Hays Unit Well No. 1. The vertical portion of the well is not located on the Lueckes' land, but portions of the horizontal drainhole cross tracts one and three. According to the Certificate of Pooling Authority, the well was drilled on a purported pooled unit consisting of 346.625 acres. Of those

---

**15.** The field rules for the Giddings (Austin Chalk–3) Field allow the drilling of horizontal wells on optional eighty acre units. *See Giddings (Austin Chalk–3) Field Rules.*

**16.** Lessees claim that even without the proposed amendment, the leases provided them

with the authority to form the two purported units at issue here, and the proposed amendment was intended only to clarify that authority.

**17.** *See* 16 Tex.Admin.Code § 3.40 (2000).

acres, 114.86 are attributable to the Lueckes—78.62 acres from tract three and 36.24 acres from tract one—totaling approximately thirty percent of the purported unit. The two tracts comprise 10.45 percent and 22.68 percent respectively of the entire purported unit. And, like the Jennifer Medusa, the Weyand Hays purported unit includes significant acreage not owned by the Lueckes.

Asserting that the purported pooled units for the two horizontal wells violated the pooling provisions in the leases, the Lueckes filed suit in October 1995. The case was tried to the bench, and the trial court ruled that Lessees had breached the provisions. The issue of damages, however, was reserved for a jury.[18]

The parties debated the appropriate method of determining the royalties due to the Lueckes. The Lueckes claimed that because their tracts were not validly pooled, they were entitled to royalty on *all* production resulting from the two purported pooled units. And because the Weyand Hays well crossed two separate tracts of the Lueckes' land, they argued that they were entitled to a *double* full royalty for the total production from that well. Based on these calculations, the total royalties sought by the Lueckes totaled $1,283,242.

Lessees proposed to allocate royalties to the Lueckes based on the share of production from the wells that could be attributed to the Lueckes' tracts. Lessees presented an expert witness who testified as to how much production could be allocated to the Lueckes' land based on the fractures underlying their land. According to appellants' expert, the Lueckes' share of production would result in royalties totaling $202,421.05, less than the Lueckes would have received if they had ratified the purported pooled units.[19]

The court's charge did not expressly adopt either of the proposed theories but generally instructed the jury to assess damages and to consider the royalties that "Plaintiffs would have received under the terms of the Leases if Defendants had performed under the Leases ." The jury assessed total damages of $833,256, attributing the following damages to each tract:

| | |
|---|---|
| Tract 1 | $374,965 |
| Tract 2 | $108,323 |
| Tract 3 | $349,968 |

Based on the amounts awarded, it is clear that the jury rejected Lessees' proposed calculations of royalties due. And although they may have adopted the Lueckes' *theory* of damages, the jury awarded the Lueckes less than the total royalties they sought.

The trial court's judgment found Browning and Marathon jointly and severally liable to the Lueckes for the sum of $833,256. The court further awarded the Lueckes $237,964.20 in prejudgment interest and $75,000 in attorneys' fees. In eight points of error, Lessees appeal the trial court's judgment. First, Lessees argue that the trial court erred in finding they failed to comply with the pooling provisions. Second, Lessees argue that the Lueckes presented no evidence of damages, or in the alternative, that the evidence presented is factually insufficient to support the damages awarded. Third, they argue that the trial court erred in failing to submit to the jury the proper measure of damages. Lessees also challenge the trial court's award of prejudgment interest, and Browning challenges the award of attorneys' fees and the trial court's decision to strike its counterclaim.

**18.** Browning attempted to file a counterclaim after the bench trial but before the submission of damages to the jury, asserting that the Lueckes had breached a letter agreement by refusing to ratify the pooled units. The trial court struck Browning's counterclaim. Browning complains of this ruling on appeal, and for reasons discussed below we affirm the trial court's decision to strike the counterclaim.

**19.** According to Lessees, the Lueckes' pro rata share in royalties based on the proportional share of acreage their land contributed to the purported units totaled $392,675.79.

## DISCUSSION

### Breach of Pooling Provisions

By their first point of error, Lessees challenge the trial court's finding that they breached the pooling provisions of the leases. The trial court order following the bench trial states that each lease "imposed certain obligations on [Lessees] with respect to the formation of pooled units for wells drilled on the Lands," and Browning and Marathon "breached the three contracts and the pooling obligations imposed by the three contracts when they created the current pooled units" for the Jennifer Medusa well and the Weyand–Hayes well. The final judgment confirms the trial court's earlier finding of a breach of contract.

Parties to an oil and gas lease must strictly comply with its terms. See *Pampell Interests, Inc. v. Wolle*, 797 S.W.2d 392, 394 (Tex.App.—Austin 1990, no writ). This principle applies to pooling clauses. See *id.* Absent express authority, a lessee has no power to pool the lessor's interests with the interests of others. See *Tichacek*, 997 S.W.2d at 170 ("For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease."); *Killingsworth*, 403 S.W.2d at 327–28 ("The lessors' land may be pooled only to the extent stipulated in the lease."). We must determine what pooling authority the leases conferred on Lessees. We know that specific anti-dilution clauses limited the authority to pool. And we know how those anti-dilution clauses are to be applied to traditional pooled units with vertical wells. The issue presented is how the anti-dilution clauses affect pooling of land traversed by horizontal drainholes.

*Do the anti-dilution provisions apply to horizontal wells?*

An oil and gas lease is a contract and must be interpreted as one. See *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, writ denied). In construing an unambiguous oil and gas lease, such as the one at issue here, we seek the intention of the parties as it is expressed in the lease. See *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). The writing alone is ordinarily deemed to express the intention of the parties; accordingly, this Court will enforce an unambiguous lease as written. See *id.*

Nothing in the pooling provisions limits their applicability to vertical wells. The intent of the parties was to authorize pooling, but to prevent the dilution of the Lueckes' royalties, whether the royalties represented production from vertical wells or horizontal wells. Indeed, it is because the provisions were not specifically limited to vertical wells that Lessees attempted to amend the provisions to gain authority to further dilute the Lueckes' share in horizontal well units. This evidences the Lessees' recognition of the unqualified language in the anti-dilution provisions. And the Lueckes' refusal to sign the amendment evidences their continued interest in anti-dilution protection. We hold that the anti-dilution provisions apply to horizontal wells.[20]

*Were the pooling provisions breached?*

Neither party disputes that the purported pooled units do not comply with the sixty percent provision in the anti-dilution clauses or that Lessees failed to utilize the lesser eighty acre spacing requirement. And the purported units are not entirely comprised of Luecke-owned land. What is disputed is whether compliance with the field rules precluded the

---

20. The Lessees' actions suggest that some form of forced pooling should apply to the drilling of horizontal wells. We leave the consideration of such proposals to the legislature or to the agency charged with regulation of oil and gas production, the Railroad Commission. Absent contrary legislative or executive directives, we shall continue to apply anti-dilution provisions to horizontal wells.

formation of pooled units in accordance with these anti-dilution provisions.

Lessees first claim that because the horizontal drainholes penetrated existing pooled units, they were required to include the acreage from those existing units in the purported horizontal units, rendering it impossible to limit the size of the purported horizontal units to eighty acres.[21] They next argue that no reasonably prudent operator would have drilled a horizontal well on an eighty acre unit, and therefore they were excused from complying with the leases. Finally, Lessees assert that the field rules require all points on the drainholes be included in the units, and because the drainhole displacement exceeded eighty acres, it was not possible to create an eighty acre unit.

With regard to their first argument, Lessees rely on the supreme court's holding in *Tichacek*. However, *Tichacek* involved only one pooled unit, and the question posed to the trial court was whether that unit was pooled in bad faith. *See* 997 S.W.2d at 167. Neither the trial court nor the supreme court considered whether the size of the unit complied with the pooling provisions or whether the lessee was required to include additional acreage from other existing units. The holding contains no language mandating the inclusion of acreage from existing units when designating new, adjacent pooled units. *Cf.* 16 Tex.Admin.Code § 3.40(d) (2000) (acreage assigned to well for production allowable shall not be assigned to any other well completed in same reservoir).

Moreover, even if we agreed that Lessees were required to include acreage from existing pooled units and were therefore absolved from complying with the eighty acre spacing requirement, they were still required to heed the provision mandating that sixty percent of each unit consist of Luecke land. Lessees have failed to demonstrate how the inclusion of acreage from existing vertical units prevented them from creating a pooled unit consisting of at least sixty percent of Luecke-owned land. Finally, even if Lessees believed the field rules required them to include acreage from existing pooled units in the purported horizontal units, they were obligated to include only that acreage necessary to satisfy the field rules. However, it appears that the purported units include non-Luecke acreage even when it was not held in an existing pooled unit traversed by the horizontal wells. In other words, the purported units appear to include non-Luecke acreage beyond what may be required by the rules they have created. *Tichacek* does not excuse the violation of the anti-dilution provisions in these leases.

 Lessees next argue that they did not have the option of creating eighty acre units because they have a duty to develop and protect the leased tracts as would a reasonably prudent operator under the same or similar circumstances, and no reasonably prudent operator would have drilled a horizontal well on an eighty acre unit. The reasonably prudent operator standard is used in the context of a lessee's performance of implied covenants. *See Tichacek*, 997 S.W.2d at 170. These implied covenants, however, are subject to the express terms in the contract. *See Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex.1984). A lessee's authority to pool derives from the provisions in the lease and is limited as stipulated in the lease. It cannot be expanded by an implied covenant. *See id.* If these Lessees determined that drilling a horizontal well on an eighty acre unit was economically impractical, they could have attempted to expand their pooling authority.[22] *Cf.*

---

**21.** Each of the existing pooled units included at least eighty acres.

**22.** Indeed, several legal articles and treatises have advised lessees to seek amendments to existing leases prior to drilling horizontal wells. *See, e.g.,* Christy M. Schweikhardt, Note, *Horizontal Perspective: Texas Oil & Gas Law in Light of Horizontal Drilling Technology,* 34 S.Tex.L.Rev. 336 (1993) (lessee should seek to amend lease and hope that lessor sees benefits of horizontal drilling); Patricia A.

*Southeastern Pipe Line Co. v. Tichacek,* 977 S.W.2d 393, 399 (Tex.App.Corpus Christi 1998) (reasonable lessee may be required to attempt solutions that are not immediately available but must be sought or negotiated), *rev'd on other grounds,* 997 S.W.2d 166 (Tex.1999). They could have sought field-wide regulatory action and attempted to convince the Railroad Commission that providing an optional eighty acre spacing requirement for horizontal wells is imprudent. *Cf. Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 568–70 (Tex.1981) (reasonable lessee may be expected to seek regulatory action). Failing that, they could have exercised the option of not drilling a well on the Lueckes' tracts. What they could not do was pool the Lueckes' interests beyond the authority expressed in the leases.

Finally, Lessees argue that the pooling provisions are intended as a means of allocating royalties and not as a limitation on drilling. Therefore, Lessees contend they had the authority to drill any size well they deemed feasible. Once the well was drilled, Lessees were obligated to assign to the unit all the acreage penetrated by the horizontal drainhole, and they no longer had the option of creating an eighty acre unit or of adhering to the sixty percent requirement because the length of the horizontal drainhole prevented it.

Before drilling the horizontal wells, Lessees were required to procure a drilling permit, delineating the size of the drilling units. *See* 16 Tex.Admin.Code § 3.37. According to the leases, if Lessees drilled on the Lueckes' land and pooled it, they were to utilize the lesser spacing requirement to reduce the need to pool non-Luecke land. The parties were aware that a drilling unit could exceed eighty acres, and they executed a lease that restricted the size of the units. To allow Lessees to drill any size

well and then attempt to comply with the leases *after* the well has been drilled would defeat the intention of the parties to limit pooled units to the smallest unit allowed by the rules. *See Killingsworth,* 403 S.W.2d at 328. In contravention of this intent, Lessees drilled wells they knew would not fit within the eighty acre spacing requirement and exceeded the authority granted in the pooling provisions. *See id.* (Railroad Commission rules cannot extend restrictive terms of lease). We hold that the trial court did not err in ruling that Lessees failed to comply with the pooling provisions in the leases.

### Damages and the Jury Charge

■ By their second point of error, appellants argue that the evidence was legally and factually insufficient to support the jury's award of damages. They also challenge the trial court's jury charge as fatally defective because it failed to sufficiently instruct the jury on the correct measure of damages. We will first address the jury charge.

The trial court instructed the jury that the Lueckes were entitled to the royalties they would have received had Lessees complied with the terms of the leases. The jurors were then asked what sum of money would compensate the Lueckes for their damages resulting from the Lessees' breach of the leases.

■ A trial court has broad discretion in determining the proper issues and instructions to be submitted to the jury, and this Court will not disturb the trial court's determinations absent an abuse of discretion. *See Lindgren v. Delta Invs.,* 936 S.W.2d 422, 426 (Tex.App.—Austin 1996, writ denied). Damages must be measured by a legal standard; that standard must be used to guide the jury in

Moore, *Horizontal Drilling—New Technology Bringing New Legal and Regulatory Challenges,* 36 Rocky Mtn. Min. L. Inst. §§ 15.01[3], 15.04 (1990) (where leases do not permit pooling of drilling units larger than specified size, operator is stuck with

acreage restrictions in lease unless lease is amended); 1 Smith & Weaver, *supra,* § 4.8 (lessee needs to assure that it is authorized to pool land into proration unit for horizontal wells within field).

# 643

determining what sum would compensate the injured party. *See Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex.1973); *Texas Commerce Bank Reagan v. Lebco Constructors, Inc.*, 865 S.W.2d 68, 75 (Tex.App.—Corpus Christi 1993, writ denied). The court's charge must be sufficiently instructive to enable the jury to make an award of damages on proper grounds and correct principles of law. *See Lebco Constructors*, 865 S.W.2d at 75. The trial court should limit the jury's consideration to the specific facts that are properly a part of the damages allowable. *See id.* Failure to guide the jury on a proper legal measure of damages results in a fatally defective submission. *See id.*

■■■■■ Although we hold that Lessees failed to comply with the pooling provisions, we disagree that this non-compliance subjected Lessees to the damages awarded by the jury. An oil and gas lease is both a contract[23] and a conveyance of an interest in real property. *See W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 28–29 (1929) (oil and gas lease involves property rights of lessor and lessee); *Eastland Oil Co. v. Fenoglio*, 102 S.W.2d 1092, 1099 (Tex.Civ.App.—Fort Worth 1937, writ dism'd w.o.j.) (oil and gas lease conveys interest in land). The proper remedy for a breach of the pooling provisions may not ignore or exceed the ownership interests conveyed under the leases. The Lueckes contracted for a share in royalties based on total production *from their land.* The pooling provisions provide an exception to this arrangement only if Lessees properly pool the Lueckes' tracts. Then by a cross-convey-

ance of interests in all pooled lands the Lueckes would be entitled to royalties on a pro rata share of production from the pooled tracts. The trial court's finding that Lessees breached the pooling provisions, which we affirm, rendered the pooled units invalid with respect to the Lueckes' land. Absent valid pooling, there is no cross-conveyance, and the Lueckes are not entitled to royalties on oil and gas produced from lands they do not own.[24]

■■■■ The jury in this case heard evidence on a variety of measures of damages but was never instructed as to which of the damage models was an appropriate basis to calculate royalties due to the Lueckes. The trial court asked the jury to award as damages the royalties the Lueckes would have been entitled to if Lessees had performed under the leases.[25] Are the Lueckes entitled to the royalties they would have received if the pooled units had not exceeded eighty acres, based on some hypothetical eighty acre tract that did not include more than forty percent of non-Luecke land? Are they entitled to royalties on all production from both wells and double production from one well that traverses two Luecke tracts, as the Lueckes urge? Or as Lessees proposed, are the Lueckes limited to royalties on the oil and gas actually produced from their lands, however that can be established? Does the rule of capture apply to horizontal wells to give validity to the Lueckes' claim to royalties on *all* production from both wells? May the jury award excessive damages in the nature of a sanction for this breach, as the Lueckes suggested at oral argument?

---

**23.** *See Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex.1981) (rights and duties of lessor and lessee are contractual); *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, writ denied) (oil and gas lease is contract).

**24.** Under the rule of capture, a vertical well may drain oil or gas from adjacent property, and it will be treated as if it were produced on the Lueckes' land. For reasons discussed

below, we find this oil and gas concept does not entitle the owner of one tract traversed by a horizontal well to royalties on all oil and gas produced by the well.

**25.** The trial court's charge instructed the jury: "Consider the following elements of damage, if any, and none other. The royalty, if any, which [the Lueckes] would have received under the terms of the leases if [Lessees] had performed under the leases."

The trial court's charge failed to guide the jury in sorting through these alternative theories of calculating the royalties to which the Lueckes were entitled for Lessees' breach of the pooling provisions. As Lessees complain, the jury charge allowed and perhaps encouraged the jury to award the Lueckes royalties on oil and gas produced from lands the Lueckes do not own. The charge perpetuates without clarifying the confusion between awarding breach of contract damages and calculating the royalties due under the leases.[26] We hold that the charge was fatally defective.

On appeal, Lessees argue that the Lueckes should only be entitled to royalties for production they can reasonably attribute to their tracts.[27] They claim that the Lueckes' proposed method of measuring damages amounts to a windfall because the Lueckes claim royalties for total production, and in the case of the Weyand Hayes well a *double* full royalty, even though most of the production came from land they do not own.

The Lueckes respond that they are only seeking to recover the benefit of their bargain—royalties for total production from the wells undiluted by distribution among other pooled landowners. And because one of the wells intersected two separate tracts of land, the Lueckes contend they are entitled to a double full royalty for that well—that is, royalties for one hundred percent of the production from the Weyand Hayes well for tract one and one hundred percent of the production from that same well for tract three. Contrary to Lessees' assertions, the Lueckes further argue that they were not required to prove the geographic origin of the minerals to demonstrate what production came from their property. We reject the Lueckes' theory of damages.

First, the Lueckes claim that because oil and gas are renegade resources, their geographic origin can never be proven with reasonable certainty. According to the Lueckes, "leases and pooling provisions exist specifically to avoid that very problem, . . . to eliminate the need for such proof by deciding in advance the terms and conditions that will determine the amount of royalties to be paid." And where such provisions are valid and have been breached, "they must be enforced." The Lueckes claim that the intent of the parties in

26. Although the pleadings and the court's charge framed the issue in terms of determining damages for a breach of contract, the presentation of evidence and argument throughout the trial focused on determining the royalties due to the Lueckes under the leases.

27. Lessees also propose assessing royalties based on production from a hypothetical eighty acre unit. In support of their theory, Lessees again rely on Southeastern Pipe Line Co. v. Tichacek, 997 S.W.2d 166 (Tex.1999), as well as Amoco Prod. Co. v. Alexander, 594 S.W.2d 467 (Tex.Civ.App.—Houston [1st Dist.] 1979), aff'd as modified, 622 S.W.2d 563 (Tex.1981); and Shell Oil Co. v. Stansbury, 401 S.W.2d 623 (Tex.Civ.App.—Beaumont), aff'd per curiam, 410 S.W.2d 187 (Tex. 1966). These three cases involve breach of the implied duty to protect against drainage, not breach of express contract terms. The parties were not relying on provisions in the lease to determine calculation of royalties. Claims of failure to protect against drainage stem from situations in which no production has resulted from the claimants' land; the allegation is that the lessees have recovered oil, gas, or minerals from adjoining tracts of land and have either failed to pool the claimants' land or have failed to drill an offset well to recover minerals that may underlie the claimants' land. When there is no producing well on the claimants' land from which to measure production, it is logical to use a hypothetical well to measure damages.

In contrast, this dispute involves the determination of royalties for production from horizontal wells that actually traverse the Lueckes' land. It is undisputed that the Lueckes' land contributes to the total production from the horizontal drainhole. Therefore, it is not necessary to speculate on production from a hypothetical eighty acre well unit. Moreover, there is no authority under the leases to form an eighty acre unit in order to calculate damages. See Grimes v. LaGloria Corp., 251 S.W.2d 755, 761 (Tex.Civ.App.—San Antonio 1952, no writ) (courts cannot create new well units if not found within agreement of parties).

executing the royalty and pooling provisions is to determine in advance how royalties should be allocated, regardless of the source of production. The leases only allow two options, according to the Lueckes: either the Lessors are entitled to royalties based on a pro rata share of acreage (if valid pooling has occurred), or they are entitled to a full royalty for all production from both wells (in the absence of pooling).

■ The Lueckes' claim to royalties on all production is tantamount to liquidated or punitive damages. The royalty provision in the leases does not evidence an intent among the parties to stipulate to liquidated damages. Rather, it specifies a one-eighth royalty on oil *"produced* and saved" from the land and on gas "produced from *said land.*" The provision does not award a royalty on all oil and gas produced from any well traversing said land and other adjacent tracts. "The intention of the parties as revealed by the provisions of a specific lease is of great importance in describing the attributes and the nature of a payment." *Morriss v. First Nat'l Bank,* 249 S.W.2d 269, 279 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.). The intent of the parties as evidenced by the language of these leases was to award the Lueckes royalties for one-eighth of the oil and gas produced from *their* land, not to provide a punitive remedy for a breach of the pooling provisions.

■ Without valid pooled units, the leases do not and cannot award the Lueckes royalties on oil and gas produced from tracts they do not own. The Lueckes rely on the remedy appropriate to vertical wells to argue that "where pooling is not valid, a landowner with a wellbore drilled on his land receives the full royalty promised in his lease, and landowners with no wellbore receive nothing." The Lueckes have a portion of both horizontal drainholes and the vertical drillsite of one well on their tracts; they argue that they are entitled to royalties for the total production (and even double production) from each well traversing each of their tracts. They rely on exhibit seventeen[28] to calculate royalties based on this theory. However, when pooling is invalid, production will be considered to take place only on the actual tract upon which it occurs. *See Tichacek,* 997 S.W.2d at 170.

■ In the case of a vertical well, traditional legal principles such as the rule of capture may support the Lueckes' theory that they are entitled to royalties for all production if the wellbore is drilled on their tract.[29] But the rule of capture, which is premised on drainage, does not support their entitlement to royalties on all production from a horizontal well, precisely because (1) the geophysical characteristics of the formation actually inhibit the natural drainage underlying the rule of capture, (2) production from multiple drillsite tracts is involved, and (3) the fractures contributing to production are not all adjacent to any single drillsite. The ability of a horizontal well to drain an elongated area depends upon the number of fractures encountered and the length of the drainhole.

As appellants' expert testified, the Austin Chalk formation has low porosity and low permeability. It is also highly fractured. Due to these characteristics, few vertical wells were successful in the Austin

---

**28.** Exhibit seventeen consists of a one-page calculation based on the Lueckes' proposed damage theory: all production from the Jennifer Medusa well multiplied by the Lueckes' one-sixteenth royalty interest and all production from the Weyand Hays well multiplied by one-eighth for tract one and another one-eighth of total production from the Weyand Hays well for tract three.

**29.** We emphasize that the rationale for such a result is that under the leases, lessors would be entitled to royalties for oil and gas produced from their land, even if that oil and gas were drained from neighboring tracts, but they would not be entitled to sanctions for lessees' failure to comply with the pooling provisions. *See Amoco Prod. Co.,* 622 S.W.2d at 571 (even if breach is malicious, intentional, or capricious, exemplary damages are not allowed for breach of contract).

Chalk prior to the advent of horizontal drilling. Horizontal wells enable operators to intersect multiple fractures, but the horizontal wellbores drain only the fracture gaps they penetrate. Indeed, if the Austin Chalk formation were prone to facilitate fieldwide drainage of existing oil and gas, horizontal drilling would not be as necessary. Simply put, the migratory nature of oil and gas that supplies the rationale for the rule of capture and the Lueckes' claim to all production from neighboring tracts does not apply to horizontal wells drilled in highly fractured formations.

Even more important is the distinction that vertical wells penetrate one tract and recover hydrocarbons from that one tract whereas horizontal wells have multiple drillsites on multiple tracts. Horizontal wells can extend across several tracts of land in a linear configuration to accommodate the length of the horizontal drainhole. Consequently, all the tracts are not contiguous. Several tracts of land may separate the penetration point of the drainhole from the terminus point. And each of the tracts traversed by the horizontal drainhole is considered a drillsite tract, which likely includes underlying fractures that are being drained by the wellbore. Thus, each point along the drainhole is contributing to production from isolated fractures, and no one drillsite is naturally draining minerals from all of the penetrated tracts. Even though the rule of capture and other principles of oil and gas law would afford the Luekes royalties on all production if a vertical well were drilled on their land without valid pooling, these principles have no application in the case of horizontal wells that contain multiple drillsites on tracts owned by multiple landowners.

Absent the ability to naturally drain neighboring tracts, the Lueckes are not entitled to production from other lessors' tracts unless there has been a cross-conveyance of property interests. Because the purported units were invalid, there has been no cross-conveyance of interests, and the Lueckes are not entitled to royalties on

production from lands they do not own. "If land has not been properly pooled, royalty on production cannot be allocated among the lessors and nonparticipating royalty interests in no-well-site tracts." *See* 1 Smith & Weaver, *supra,* § 4.8. Although the Lueckes' tracts are drillsite tracts, they cannot claim royalties for total production when they have no legal claim to oil and gas recovered from other lessors' drillsite tracts.

In addition, the Lueckes' proposed measure of damages, the court's charge, and the jury's award do not provide a workable construction of the royalty provision in the leases that can be applied prospectively. Because the damages are not based on production from the Lueckes' land as mandated by the royalty provision, the parties have no tool by which to determine future royalties, making Lessees vulnerable to future damage claims.

■ The Lueckes insist that public policy supports applying traditional rule of capture principles to this dispute involving horizontal wells. But this is not simply a dispute between two private parties. Rather, the legal principles applicable to horizontal wells involve an industry that is highly regulated, one that is subject to the rules imposed by the Railroad Commission and statutes enacted by the legislature. Factors such as the prevention of waste, protection of the rights of landowners, and maximized recovery of minerals bear upon this area of law and necessarily affect the rights of the parties.

■ Moreover, in considering public policy, we must attempt to balance two competing interests. First, we recognize that Lessees should not be allowed to ignore anti-dilution provisions and exceed their pooling authority with impunity. A reasonably prudent operator may conclude that horizontal drilling in the Austin Chalk formation will benefit a lessor, and the operator may correctly opine that reasonable prudence dictates the drilling of a horizontal well that exceeds the authority

granted under the applicable lease. Nevertheless, rather than ignore the written lease, the prudent operator must seek to negotiate a solution mutually beneficial to both the lessee and the lessor or else forego drilling.

 On the other hand, we recognize the immense benefits that have accompanied the advent of horizontal drilling, including the reduction of waste and the more efficient recovery of hydrocarbons. Draconian punitive damages for a lessee's failure to comply with applicable pooling provisions could result in the curtailment of horizontal drilling. We decline to apply legal principles appropriate to vertical wells that are so blatantly inappropriate to horizontal wells and would discourage the use of this promising technology. The better remedy is to allow the offended lessors to recover royalties as specified in the lease, compelling a determination of what production can be attributed to their tracts with reasonable probability. *See Ortiz Oil Co. v. Luttes*, 141 S.W.2d 1050, 1053 (Tex. Civ.App.—Texarkana 1940, writ dism'd by agr.) (fact that exact amount of oil produced cannot be precisely determined is no reason for denying recovery based on jury's approximation). The Lueckes are entitled to the royalties for which they contracted, no more and no less.

 The jury should have been instructed to follow these principles in calculating the royalties due to the Lueckes under the leases.[30] We sustain the point of error and hold that the charge is fatally defective for failing to provide the jury

instructions concerning proper grounds and correct principles of law for determining the royalties due to the Lueckes. Although we have affirmed the trial court's ruling that Lessees breached the pooling provisions, in the interest of justice we remand the determination of damages for a new trial.[31]

## Prejudgment Interest and Attorneys' Fees

 On the issue of prejudgment interest, Browning first argues that section 91.402 of the Natural Resources Code prohibits prejudgment interest in this type of dispute. *See* Tex.Nat.Res.Code Ann. § 91.402(b) (West Supp.2000). The statute provides that payment of proceeds may be withheld without interest when there is: "a reasonable doubt that the payee: ... (B) has clear title to the interest in the proceeds of production." *Id.* Because this dispute concerns the Lueckes' royalty share in production, Browning argues that this exception should apply here. We disagree. The purpose of the statute is to protect royalty owners from intentional payment delays while permitting delays that result from legitimate *title* disputes. *See Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451, 461 (Tex.1998) (citing bill analysis). The crux of this case is whether the Lueckes are entitled to a pro rata share of royalties under the pooling provisions or royalties for all production from their land. Their *entitlement* to royalties, however, was never in dispute. All parties agreed that the

---

**30.** We note that in presenting their breach of contract claim to the trial court and in their arguments made to this Court, the Lueckes sought damages based on the royalties they were due under the leases. Accordingly, our task on appeal is to construe and enforce the leases as written and determine the Lueckes' rights to royalties based exclusively on the provisions in the leases. Lessors may not be limited to this remedy on remand.

**31.** Recognizing that the rules of appellate procedure do not permit remand for a separate trial on unliquidated damages when liability is contested, we hold that good cause

exists in this case to support a suspension of the rule. *See* Tex.R.App.P. 44.1(b); *see also id.* 2 (appellate court may suspend rule's operation in particular case and order different procedure). We note that the case was bifurcated at the trial level; the issue of liability was submitted to the bench, while the issue of damages was the only issue tried to the jury. Thus, this is not a case that presents a risk of confusion for the jury, and the interests of justice warrant a new trial on the issue of damages alone under these novel circumstances.

Lueckes' royalty interests are valid. Thus, the Natural Resources Code does not excuse Lessees from paying prejudgment interest where there is no legitimate title dispute, but rather a dispute as to how to calculate the Lueckes' royalties.

■ All parties agree that prejudgment interest, if any, shall be computed as simple interest. *See Johnson & Higgins v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex.1998). The nature of the underlying dispute determines whether a court should apply prejudgment interest under general principles of equity or under section 301.002 of the Finance Code. *See Southeastern Pipe Line Co. v. Tichacek,* 977 S.W.2d 393, 401–02 (Tex.App.Corpus Christi 1998), *rev'd on other grounds,* 997 S.W.2d 166 (Tex.1999). The two sources for prejudgment interest provide different accrual periods and different interest rates. On remand, the nature of the dispute in the new trial may change. We will withhold comment on the appropriate manner of calculating prejudgment interest except to agree with Lessees that prejudgment interest should not be assessed on funds that were deposited into the registry of the court. *See Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.,* 3 S.W.3d 112, 125 (Tex.App.—Corpus Christi 1999, pet. denied); *Edwin M. Jones Oil Co. v. Pend Oreille Oil & Gas Co.,* 794 S.W.2d 442, 450 (Tex.App.—Corpus Christi 1990, writ denied). Similarly, the manner of trying the case on remand will determine if there is a legal basis for the award of attorneys' fees.

## Counterclaim

■ Browning argues that the trial court erred in striking its counterclaim. Browning's counterclaim was based on a letter agreement between the Lueckes, Browning's predecessor, and a third party.

The agreement assigned an overriding royalty interest in tract two to a company owned by Jimmie Luecke. In exchange, the Lueckes agreed to execute unit designations authorizing the pooling of the Lueckes' mineral interests. Pursuant to this agreement, Browning requested that the Lueckes sign pooling agreements for the two horizontal wells. After the Lueckes refused, Browning attempted to file a counterclaim, asserting breach of the letter agreement.[32] The trial court struck Browning's counterclaim. Browning asserts on appeal that the third and fourth elements of a compulsory counterclaim are not present here, and the trial court therefore erred in characterizing the counterclaim as compulsory and denying Browning the opportunity to litigate it.

■ Under rule 97(a) of the Texas Rules of Civil Procedure, a counterclaim is compulsory if: (1) it is within the jurisdiction of the court; (2) it is not, at the time of filing the answer, the subject of a pending action; (3) the action is mature and owned by the pleader at the time of filing the answer; (4) it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; (5) it is against the opposing party in the same capacity; and (6) it does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction. *See* Tex.R.Civ.P. 97(a); *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 247 (Tex.1988). A claim satisfying all six of these elements must be asserted in the initial action. *See Wyatt,* 760 S.W.2d at 247.

■ The same "transaction or occurrence" element has been broadly construed and depends upon the logical relationship of the occurrences. *See Jack H.*

32. Browning first filed its counterclaim on January 22, 1997. The bench trial on breach of contract liability was held on October 10, 1996. The trial court initially announced its decision, finding Lessees liable for breach of the leases, in a letter ruling dated October 30, 1996. However, the written order was not filed until March 1998. Nevertheless, none of the parties disputes that the counterclaim was filed *after* the court had already ruled on the issue of liability.

*Brown & Co. v. Northwest Sign Co.,* 718 S.W.2d 397, 399 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (citing *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926)). Application of the logical relationship test requires that both claims concern at least some of the same facts. *See id.* at 400. Here, both the counterclaim and the original breach of contract dispute concern the validity of the purported horizontal well units. Indeed, part of the relief requested by Browning in its counterclaim was specific performance, compelling the Lueckes to ratify the purported units, and thus rendering the trial court's finding of a breach of the pooling provisions a nullity. We hold there is a logical relationship between the letter agreement and the leases, and · we hold that Browning's breach of contract claim arose out of the same transaction or occurrence that was the subject of the Lueckes' breach of contract claim.

▉ Browning argues its claim for breach of the letter agreement did not mature "until it demanded execution of pooling documents and that demand was refused." Browning did not demand execution of the agreement until December 1996. A claim that arises out of the same transaction or occurrence of a previous suit and that, *with due diligence,* could have been litigated in the prior suit is barred if not asserted in the initial suit. *See Barr v. Resolution Trust Corp., ex rel. Sunbelt Fed. Sav.,* 837 S.W.2d 627, 631 (Tex.1992) (holding *res judicata* precludes subsequent suit when, through exercise of due diligence, it could have been litigated in prior suit); *see also Northwest Sign Co.,* 718 S.W.2d at 398 (compulsory counterclaim rule is broader than *res judicata* ) (citing *Griffin v. Holiday Inns of America,* 496 S.W.2d 535, 539 (Tex.1973)). In this case, Browning was aware of the Lueckes' opposition to the purported pooled units prior to December 1996. The Lueckes' act· of filing a breach of contract claim should have alerted Browning that they would not authorize the pooling of their mineral in-

terests for the horizontal wells under the letter agreement, and through due diligence, Browning could have demanded execution of the agreement and filed its counterclaim prior to the bench trial on the Lueckes' breach of contract claim. We hold the trial court did not err in striking Browning's counterclaim.

## Motion for Rehearing

On rehearing, Lessees insist that this Court should sustain their legal sufficiency complaints and render judgment that the Lueckes take nothing. Their argument is two-fold. First, because the royalties offered by the Lessees under the pooling provisions of the leases exceed the royalties the Lueckes would have been entitled to under the guidelines set forth in this opinion, the Lueckes failed to prove that they suffered any damages. Second, the Lueckes refused to offer any evidence of damages other than exhibit seventeen, calculating royalties based on total production from each horizontal well for each tract traversed by the wells. The Lueckes relied on the rule of capture as applied to vertical wells to claim royalties on one hundred percent of production from one horizontal well and two hundred percent of production from the second horizontal well. Our pronouncement that the rationale underlying the rule of capture does not apply to production from horizontal wells is a decision of first impression in this state. In the interest of justice we remand to allow the Lueckes to present their case under the appropriate legal principles set forth in this opinion. *See Boyles v. Kerr,* 855 S.W.2d 593, 603 (Tex.1993) (remand appropriate where party proceeded under wrong legal theory and reviewing court subsequently recognized cause of action that may be applicable to facts of case); *Houston Fire & Cas. Ins. Co. v. Nichols,* 435 S.W.2d 140, 143 (Tex.1968) (to deny plaintiff opportunity to fully develop evidence under different damage theory would be unjust); *Scott v. Liebman,* 404 S.W.2d 288, 294 (Tex.1966) (remand in interest of justice appropriate where party

requested jury issues in reliance on precedent that was subsequently overruled).

## CONCLUSION

We affirm the trial court's dismissal of Browning's counterclaim and its ruling that Lessees failed to comply with the pooling provisions in the leases. This failure rendered the purported pooled units invalid with regard to the Lueckes' tracts. The Lueckes were entitled to royalties on the oil and gas produced from their land, but were not entitled to royalties on production that was recovered from lands they do not own. The charge to the jury failed to provide jurors the proper grounds and correct principles of law for calculating the royalties due the Lueckes under these circumstances and was fatally defective. In the interest of justice, we remand to the trial court for a new trial on damages consistent with this opinion. Accordingly, we also reverse the awards of attorneys' fees and prejudgment interest based on the damage award and remand for further proceedings consistent with this opinion.