# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00258-CV

**Railroad Commission of Texas and Magnolia Oil & Gas Operating LLC, Appellants**

**v.**

**Elsie Opiela and Adrian Opiela, Jr., Appellees**

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-000099, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## O P I N I O N

This appeal arises from the complaint by Elsie Opiela and Adrian Opiela, Jr., (Opielas) about a permit issued by the Railroad Commission of Texas to Magnolia Oil & Gas Operating LLC (collectively, Appellants) to drill a horizontal oil well from one parcel of land, through another, and into land with minerals leased in part from the Opielas. The dispute centers on the laws, regulations, and judicial and Commission decisions concerning pooling of tracts of land for purposes of oil production along with production-sharing agreements (PSAs) and allocation wells—methods of designating how to share production. The Opielas' lease prohibits pooling "in any manner whatever" for oil production, and the Opielas did not sign a consent to pool or a PSA. Nevertheless, after a previous operator obtained an allocation-well permit, Magnolia obtained an amended permit to drill a PSA well upon the Commission's finding that Magnolia had made a good-faith showing that it had the right to drill and operate a horizontal well in the minerals owned by the Opielas because at least 65% of their fellow interest holders

had assented to share the production in some way. The Commission denied the Opielas' complaint that Magnolia lacked a good-faith claim to operate the Audioslave A 102H Well (the Well).

The trial court reversed the Commission's order and remanded this cause to the Commission, concluding that the Commission erred in finding that Magnolia showed a good-faith claim of right to drill the Well. The trial court also concluded that the Commission erred in adopting and applying rules for PSA well permits, deciding that the Commission lacked the authority to review whether an applicant seeking a well permit has right under a lease or other relevant title documents to drill the Well, and failing to consider the pooling clause in the Opielas' lease.

Appellants contend on appeal that existing rules adopted through formal notice-and-comment rulemaking provide an adequate framework for the Commission to issue well permits for unpooled multi-tract horizontal wells. The Commission contends that substantial evidence supported its conclusion that Magnolia was entitled to a drilling permit. Magnolia contends that the trial court erred by holding that the Commission is required to evaluate whether an operator has both a valid lease and pooling authority when drilling a horizontal well across multiple tracts. Magnolia also contends that the trial court required the Commission to exceed its jurisdiction by adjudicating disputes between private parties over the authority to drill horizontal wells.

We will affirm the trial court's judgment in part, reverse in part, and remand the cause to the Commission for further proceedings.

**BACKGROUND**

Pooling, PSAs, and, to a lesser extent, allocation wells are central to this dispute. "Pooling" refers to the combining of tracts from more than one oil and gas lease for the drilling of a well where production from any of the tracts in the pooled unit is treated as production from all of the tracts. *See Hooks v. Samson Lone Star, LP*, 457 S.W.3d 52, 62 (Tex. 2015). Like pooling, PSAs and allocation wells link adjacent properties for the production of minerals,[1] but Texas statutes and regulations do not expressly require pooling of tracts as a prerequisite for every horizontal drilling of a wellbore that crosses property lines. An allocation well is "a horizontal well that traverses the boundary between two or more leases that have not been pooled and for which no agreement exists among the royalty owners as to how production will be shared." Clifton A. Squibb, *The Age of Allocation: The End of Pooling As We Know It?*, 45 Tex. Tech L. Rev. 929, 930 (2013). Absent agreement, production is allocated to the owners of the mineral estate in the tract where minerals are captured by the wellbore. *Id.* at 934. Under a PSA, the interest owners on the various tracts agree how production from a multitract well will be shared irrespective of where take points are. *See* E. Smith & J. Weaver, Tex. Law of Oil & Gas § 9.9(B), at 9-167-70 (2d Ed. 2020).

The Opielas are among the successors to the mineral interest of Otha Person and Myra Person, who leased their land (the Tract) for mineral exploration in 1955. The lease authorized a one-eighth royalty on oil produced from the Tract and stated that "[n]othing contained herein shall authorize Lessee in any manner whatever to pool said land or any part of

---

[1] Magnolia submitted and the Commission accepted as showing good faith consents to pooling by some royalty owners as the equivalent of signing the PSA and a good-faith claim of right to drill.

the same for oil, and for the production of oil from said land under this lease . . . ." The Opielas own 25% of the royalty interest and the remaining 75% of the royalty interest is owned by more than thirty interest holders who are not parties to this appeal.

EnerVest Operating, LLC, applied to the Commission on May 1, 2018, for a drilling permit for an allocation oil well. EnerVest proposed to drill on one property and direct the Well horizontally to cross under a road before entering the Tract underground. On May 2, 2018, the Opielas filed a complaint asking the Commission to refrain from issuing the permit because EnerVest did not have authority to pool the Tract with any other property. The day after the complaint was filed, the Commission issued the permit upon finding that EnerVest showed a good-faith claim to the right to drill into the Tract. EnerVest began drilling four days after the permit was issued, which was before the Opielas served their complaint on EnerVest. EnerVest responded that it did not need to pool the tracts crossed by the wellbore under Commission decisions in *Devon* and *Klotzman*. *See* Texas R.R. Comm'n, *Complaint of Monroe Properties, Inc., et al. that Devon Energy Production Co, L.P. Does Not Have a Good Faith Claim to Operate the N l Helped 120 (Alloc) Lease, Well No. 6H, Phantom (Wolfcamp) Field, Ward County, Texas*, Docket No. 08-0305330 (Dec. 18, 2017) (order of dismissal) ("*Devon*"); Texas R.R. Comm'n, *Application of EOG Resources, Inc. for its Klotzman Lease (Allocation) Well No. 1H, (Status No. 744730), Eagleville (Eagleford-Z) Field, Dewitt County, as an Allocation Well Drilled on Acreage Assigned from Two Leases*, Docket No. 02-0278952 (Sept. 24, 2013) (final order) *("Klotzman")*. EnerVest conveyed its interest to Magnolia before the contest was resolved.

On August 29, 2018, Magnolia applied for a permit on the Well to be drilled as a PSA well. As part of their application, Magnolia submitted a Form W-1 and Form P-16 as

4

required for applicants seeking a permit for a horizontal well.  *See* 16 Tex. Admin. Code §§ 3.5,

.40(g) (2018) (currently codified at § 3.40(i)), .86.[2]  Neither the Form W-1 in the record nor the

2016 version of Form P-16 or the  instructions for filling out the form in effect in 2018 defined a

PSA well or mention a threshold percentage of signatories to a PSA.[3]

The Commission issued Magnolia the permit on August 30, 2018.  The permit

included this disclaimer:

> Commission Staff expresses no opinion as to whether a 100% ownership interest
> in each of the leases alone or in combination with a "production sharing
> agreement" confers the right to drill across lease/unit lines or whether a pooling
> agreement is also required.  However, until that issue is directly addressed and
> ruled upon by a Texas court of competent jurisdiction it appears that a 100%
> interest in each of the leases and a production sharing agreement constitute a
> sufficient colorable claim to the right to drill a horizontal well as proposed to
> authorize the removal of the regulatory bar and the issuance of a drilling permit
> by the Commission, assuming the proposed well is in compliance with all other
> relevant Commission requirements.

The Opielas amended their complaint about the EnerVest permit on September

28, 2018 to challenge the permit issued to Magnolia.  The Opielas contended that Magnolia

---

[2]  All citations to the Texas Administrative Code will be to the version in effect in 2018 when the applications were made, unless otherwise noted.

[3]  *See* Texas R.R. Comm'n 2016 Form P-16 for Acreage Designation (available at https://web.archive.org/web/20160804030249/http://www.rrc.texas.gov/media/31924/p-16p-final.pdf); *see also* Texas R.R. Comm'n 2016 Form P-16 Instructions (available at https://web.archive.org/web/20160804030249/http://www.rrc.texas.gov/media/31920/p-16-instructions-final.pdf).  In Magnolia's reply in support of its motion to dismiss the Opielas' complaint about the permit, filed December 7, 2018, Magnolia states that Form P-16 was "last revised January 2016."  The instructions to Form P-16 were revised in February 2019 and finalized in June 2019—after the application, permit, complaint, and hearing in this case.  *See* Tex. R.R. Comm'n, *Complaint of Elsie Opiela and Adrian Opiela Regarding Magnolia Oil & Gas Operating LLC's (521544) Audioslave A Lease, Well No. 102H, Permit No. 839487, Sugarkane (Austin Chalk) Field, Karnes County, Tex.*, Oil & Gas Docket No. 02-0315435, 4-5, n.5,7 (Aug. 30, 2019) (PFD).

could not have a good-faith claim to operate the Well because the Opielas' lease did not authorize pooling of the Tract with others for oil production.

The hearings examiners heard the complaint on January 23, 2019, and issued their proposal for decision (PFD) on August 30, 2019. Tex. R.R. Comm'n, *Complaint of Elsie Opiela and Adrian Opiela Regarding Magnolia Oil & Gas Operating LLC's (521544) Audioslave A Lease, Well No. 102H, Permit No. 839487, Sugarkane (Austin Chalk) Field, Karnes County, Tex.*, Oil & Gas Docket No. 02-0315435, 4-5, n.7 (Aug. 30, 2019) (PFD). The examiners found that the Commission had previously determined that written oil leases covering tracts the Well traverses are a reasonably satisfactory showing of a good-faith claim to operate an allocation well, and that written agreements with 65% of all mineral and working interest owners for each tract the Well produces from would be sufficient to get a permit to operate a well. The examiners also found that Magnolia had PSAs—which they found included a PSA, consent to pool, or ratification of unit—with over 65% of the mineral and working interest owners. The PFD also included conclusions of law that Magnolia provided a reasonably satisfactory showing of a good-faith claim to operate the Well and that denied the Opielas' request that the Commission revoke Magnolia's permit. The Commission adopted the findings and conclusions in the PFD as its own in its Final Order ("the Order").[4]

The Opielas sought judicial review. Among their contentions, the Opielas argued that the Commission granted the permit pursuant to informal rules regarding PSA and allocation wells that were promulgated outside the APA and do not fall within any recognized exception to the requirement of formal rulemaking; they contended that rules for allocation and PSA well

---

[4] Because the Commission adopted the PFD's findings and conclusions in its Final Order, we will sometimes refer to the findings and conclusions as those of the Commission.

6

permits are not found in the administrative code. They argued that the Commission erred by adopting its findings from previous contested cases stating that the Commission lacks jurisdiction to review Magnolia's authority under the lease because the lease does not allow Magnolia to drill the PSA well. The Opielas contended that Magnolia does not have a good-faith claim of right to drill a well and that the issuance of the permit violated the Commission's informal rules because the agreements used to reach the 65% threshold included consents to pool. The Opielas contended that the Commission disregarded Texas Supreme Court precedent by concluding it has no jurisdiction to review whether an operator seeking a well permit has a good-faith claim under the lease to drill a well. The Opielas contended that the Commission failed to examine the lease and title documents under which Magnolia claims authority to drill the Well. The Opielas argued that the Commission erred in finding that Magnolia had shown a good-faith basis for the right to drill the Well because their lease prohibits the lessee from pooling this tract with others, does not permit allocation of production, and thus requires that any royalty be attributable to production solely from their tract.

The trial court concluded as follows:

1. The Commission erred in adopting rules for allocation and Production Sharing Agreement ("PSA") well permits without complying with the requirements of the Administrative Procedure Act, Tex. Gov't Code § 2001.001 et seq., and further erred in applying those rules by issuing well permits for the Audioslave A 102H Well (the "Audioslave Well").

2. The Commission erred in concluding it has no authority to review whether an applicant seeking a well permit has authority under a lease or other relevant title documents to drill the well.

3. The Commission erred in failing to consider the pooling clause of the lease covered by the Audioslave Well in deciding that Magnolia has a good faith claim to operate the well.

7

4. The Commission erred in finding that Magnolia showed a good faith claim of right to drill the Audioslave Well.

The trial court remanded the cause to the Commission, and this appeal followed.

## STANDARDS OF REVIEW

A court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

> shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> (A) in violation of a constitutional or statutory provision;
> (B) in excess of the agency's statutory authority;
> (C) made through unlawful procedure;
> (D) affected by other error of law;
> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2). Courts examine whether there is some reasonable basis in the record for the action taken by the agency, not whether the agency reached the correct conclusion. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995). Courts review an agency's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Westlake Ethylene Pipeline Corp. v. Railroad Comm'n*, 506 S.W.3d 676, 681 (Tex. App. 2016). We may not substitute our judgment for the agency's on the weight of the evidence on questions committed to the agency's discretion, but we are not bound by errors of law. *See* Tex. Gov't Code § 2001.174; *Office of Pub Util. Counsel v. Texas-N.M. Power Co.*, 344 S.W.3d 446, 450 (Tex. App.—Austin 2011, pet. denied).

Whether substantial evidence supports the agency's decision is a question of law. *Texas Comm'n on Envtl. Quality v. Maverick County*, 642 S.W.3d 537, 547 (Tex. 2022). Courts presume that the Commission's order is supported by substantial evidence, and the complaining party has the burden to overcome that presumption. *Id*. Substantial evidence does not mean a large or considerable amount of evidence but is such relevant evidence as a reasonable mind might accept as adequate to support a finding of fact. *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ). Where an agency has specialized knowledge, the court may defer to the agency's expertise and responsibility to develop regulatory policy. *In re SWEPI L.P. d/b/a Shell Western E & P*, 103 S.W.3d 578, 587 (Tex. App.—San Antonio 2003, no pet.).

Courts interpret agency regulations using the same principles we apply when construing statutes. *Patients Med. Ctr. v. Facility Ins.*, 623 S.W.3d 336, 341 (Tex. 2021). We start with the rule's plain text. *Maverick County*, 642 S.W.3d at 544. We must first determine what the rule's text means before deciding whether the agency's interpretation contradicts the text. *Id*. Courts will uphold an agency's interpretation of its own rule if the interpretation is reasonable and does not contradict the rule's plain language. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011).

**DISCUSSION**

The parties do not dispute that Magnolia has a valid lease to drill on any of the tracts contacted by the wellbore. The issue is whether the record supports granting a permit for a PSA well under relevant and proper rules. Appellants contend that the trial court should have affirmed the Commission's order because Magnolia proved its entitlement to the permit granted. The Commission contends that its order issuing the permit based on a good-faith claim to drill

and operate the Well was supported by substantial evidence. The Commission also contends that, because it complied with notice-and-comment rulemaking to adopt rules and forms, it was not required to also promulgate by rulemaking the policy for issuing a permit to drill and operate a horizontal well. Magnolia similarly contends that the APA did not require the Commission to conduct formal rulemaking before issuing permits for unpooled multi-tract horizontal wells given its broad statutory authority, regulations, and discretion to exercise its expertise. Magnolia also contends that the trial court erred by holding that the Commission is required to evaluate whether an operator has both a valid lease and pooling authority when drilling a horizontal well across multiple tracts. Magnolia further contends that the trial court required the Commission to exceed its jurisdiction by holding that the Commission must adjudicate disputes between private parties over the authority to drill horizontal allocation wells as part of its good-faith evaluation of an application for a drilling permit. We will evaluate these overlapping issues together in the context of the trial court's judgment and the Commission's order.

1.      **Applicable statutes, rules, and decisional law background**

The Legislature gave the Commission jurisdiction over all oil and gas wells in Texas. Tex. Nat. Res. Code § 81.051(a)(2). Conservation and development of all natural resources of this state is among the public rights and duties described in the Texas Constitution. Tex. Const. art. XVI, § 59(a). The Legislature empowered the Commission to "make and enforce rules and orders for the conservation of oil and gas and prevention of waste of oil and gas." Tex. Nat. Res. Code § 85.201. Commission rules require application for a permit to drill an oil well. 16 Tex. Admin. Code § 3.5(a). The application for the permit must be filed "on a form approved by the Commission," *id*., which implies the Commission has the power to approve forms. The Texas Supreme Court has held that, to show entitlement to a permit, an

10

operator must make a reasonably satisfactory showing of a good-faith claim to operate the proposed well. *Magnolia Petroleum Co. v. Railroad Comm'n*, 170 S.W.2d 189, 191 (Tex. 1943). The applicant can make a reasonably satisfactory showing of a good-faith claim of ownership even if another in good faith disputes title. *Id.* The Commission's rule defines "good-faith claim" as a "factually supported claim based on a recognized legal theory to a continuing possessory right in a mineral estate, such as evidence of a currently valid oil and gas lease or a recorded deed conveying a fee interest in the mineral estate." 16 Tex. Admin. Code § 3.15(a)(5) (regulations for surface-equipment removal requirements and inactive wells); *see also* Tex. Nat. Res. Code § 89.002(11) (using same definition in context of abandoned wells statute); *see also Roland Oil Co. v. Railroad Comm'n*, No. 03-12-00247-CV, 2015 WL 870232 at *2 (Tex. App.—Austin Feb. 27, 2015, pet. denied) (mem. op.).

In the 1943 *Magnolia* case, the Texas Supreme Court held that the Commission does not undertake to adjudicate questions of title or rights of possession when it grants a drilling permit. 170 S.W.2d at 191. The Commission's role in granting permits is to administer the conservation laws of Texas and to determine whether they bar drilling the well. *Id.* Title questions are a matter of common law that must be settled in the courts. *Id.* The trial court in *Magnolia* canceled a drilling permit granted by the Commission to E.A. Landman because the trial court found there was a bona fide controversy regarding whether Landman or Magnolia had proper title to the leasehold. *Id.* at 190. The court of appeals reversed the judgment canceling the permit but suspended it pending determination of the title suit in the county where the land was. *Id.* In reversing both the trial and appellate courts, the Texas Supreme Court wrote that granting a permit "merely removes the conservation laws and regulations as a bar to drilling the well . . . . Where there is a dispute as to those rights, it must be settled in court." *Id.* at 191. The

court concluded, "If the applicant makes a reasonably satisfactory showing of a good-faith claim of ownership in the property, the mere fact that another in good faith disputes his title is not alone sufficient to defeat his right to the permit; neither is it ground for suspending the permit or abating the statutory appeal pending settlement of the title controversy." *Id.*

While the Legislature has enacted statutes governing pooling of lands for oil and gas production, it has not done so for PSAs for horizontally drilled wells. The Legislature has considered bills amending the Natural Resources Code to expressly authorize—if not expressly prohibited by a lease, deed, or other contract and if granted a permit by the Commission—drilling and producing oil or gas from wells that traverse multiple tracts to prevent waste, promote conservation, or protect correlative rights. *See, e.g.,* Tex. H.B. 1552, 84th Leg., R.S. (2015); *see also* Tex. S.B. 367, 87th Leg., R.S. (2021). Bills to establish a statutory structure for unitization of separate tracts and involve the Commission in determining whether the unitization plan is fair, reasonable, and equitable for all interests have also been introduced but not passed. *See* Tex. S.B. 177, 85th Leg., R.S. (2017); Tex. H.B. 100, 83rd Leg., R.S. (2013).

Similarly, the Commission has not adopted Administrative Code rules specific to PSAs, though it has requested information about PSAs through its forms[5] and has granted permits for wells that were the subject of PSAs. The Commission has both rulemaking and adjudicatory powers with which to regulate oil and gas production. *Railroad Comm'n v. Lone Star Gas Co.,*

---

[5] *See, e.g.*, 16 Tex. Admin. Code §§ 3.40(g) (Assignment of Acreage to Pooled Development and Proration Units), 3.86(g)(4) (Horizontal Drainhole Wells) (requiring filing of Texas R.R. Comm'n 2022 Form P-16 for Acreage Designation, *available at* https://www.rrc.texas.gov/media/tppn4axe/p-16.pdf (filer must state that "[a]ll tracts listed will actually be traversed by the wellbore or the filer has pooling authority or other contractual authority, such as a production sharing agreement, authorizing inclusion of the non-drill site tract in the acreage assigned to the well.")).

844 S.W.2d 679, 688 (Tex. 1992).  The Commission may exercise "informed discretion" whether to use rulemaking or adjudication, but should choose rulemaking except in cases when there is a danger that rulemaking would frustrate the effective accomplishment of the Commission's functions.  *Id.* at 689.  The Commission's adjudicatory decisions do not necessarily bind it in future adjudications, but an agency must explain its reasoning when it appears to depart from its policy or there is an apparent inconsistency in its decisions.  *Texas State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 534 (Tex. App.—Austin 2014, pet. denied).  In 2008, two of the three Commissioners voted to approve a permit application pursuant to a PSA and directed staff that permit applications for PSA wells "should be approved when the usual criteria are met and the operator certifies that at least 65% of the working and royalty interest owners in each component tract have signed the production sharing agreement."  Texas R.R. Comm'n, Formal Comm'n Actions, Hearings Div., p. 3, Status #665639 (Sept. 9, 2008) (available at https://web.archive.org/web/20161222204413/https://www.rrc.texas.gov/media/9027/090908.pdf).[6]

## 2.  The Commission's power to issue permits for multi-tract horizontal wells without pooling

The trial court held that the Commission erred by failing to consider the pooling clause of the lease covered by the Well in deciding that Magnolia has a good-faith claim to operate the Well.  The Opielas' lease provides:

> Nothing contained herein shall authorize Lessee *in any manner whatever* to pool said land or any part of the same for oil, and for the production of oil from said land under this lease, and in the event oil is discovered on and under said land Lessor shall receive as his royalty the full one-eighth of all the oil produced and

---

[6] All sites listed by URL in this opinion were last visited June 26, 2023.

saved from said entire tract of land leased hereunder, as herein in Paragraph 3 provided.

(Emphasis added.) The Opielas have not consented to pooling or signed a PSA and contend that the PSA well is "pooling by another name" and, as such, is prohibited by the lease; thus, they argue, the Commission cannot correctly find that Magnolia has a good-faith claim to the right to drill a horizontal well into the tract. The requirement that an applicant file a Form P-16 for a permit for a horizontal well appears in Rule 40, entitled the Assignment of Acreage to Pooled Development and Proration Units. 16 Tex. Admin. Code § 3.40(g). We must examine the relationship of pooling and PSAs to determine whether the assertion of right to drill under a PSA triggers and infringes on an anti-pooling clause in a lease.

Pooling is the subject of a chapter of the Natural Resources Code and other statutes in that code, in contrast to the silence regarding PSAs. *See* Tex. Nat. Res. Code ch. 102; *see also, e.g., id.* §§ 71.051-.057, 101.011-.013. Pooling is often done to allow smaller tracts to combine to meet requirements for spacing or density of wells. *See Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 634 (Tex. App.—Austin 2000, pet. denied). Mineral operations anywhere in the combined tracts, or unit, are treated as if occurring on all tracts in the unit. *Id*. Pooling links properties such that the owners of the pooled tracts own joint undivided interests in the royalty earned from production under any of the tracts pooled. *Id.* Proceeds from production from one of the pooled tracts are shared by all owners of the tracts in proportion to the individual tract's proportion of the pooled acreage. *Id.*; *see also Hooks*, 457 S.W.3d at 62-63. A lessee has no power to pool absent express authority in its leases. *Luecke*, 38 S.W.3d at 634.

Pooling of tracts is not expressly required by Texas statutes or regulations for horizontal drilling of a wellbore that crosses property lines. Commentators have noted that, as of

14

the start of 2022, no statute or regulation yet addressed either PSA or allocation well permits. 2 E. Smith & J. Weaver, Tex. Law of Oil & Gas § 9.9(B), at 9-167-68 (2d Ed. 2020). Though stating that PSAs could form "super-pooled units"—a term not found in Texas statutes or rules— that combine pooled acreage into larger pools, the commentators describe PSAs as beginning with private contractual agreements among the owners and operators of pooled or unpooled tracts that will be traversed by a horizontal well. *Id.* at 9-169. A horizontal well is initially drilled vertically, then turns horizontal and can extend for hundreds of feet across multiple tracts. 38 S.W.3d at 634. Each tract traversed by the horizontal wellbore is a drillsite tract, and each production point on the wellbore is a drillsite. *Id.* Importantly, lessors in *Luecke* were not entitled to production from other lessors' tracts unless there had been a cross-conveyance of property interests; without valid pooling, the division of royalties was based on what production could be attributed to the lessors' tracts with reasonable probability. *Id.* at 646. By contrast, under a PSA, the interest owners on the various tracts agree how production from a well will be shared. 2 E. Smith & J. Weaver, Tex. Law of Oil & Gas § 9.9(B), at 9-170.

Before the hearings examiners in this case, James Clark, qualified as an expert witness on the Commission's procedures for permitting and other regulatory matters, testified that the PSA in this case divided production based on the effective lateral length on each tract.[7] Clark testified that "if it were a pooled unit, it would be neither a PSA nor an allocation," but that a lessee who had pooling authority perhaps could choose whether to pool or use a PSA. We conclude that production through a PSA well is not the same as pooling under Texas law.

---

[7] A similar method is used to apportion production for an allocation well. *See Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 286 (Tex. App.—San Antonio 2013, no pet.).

Consistent with our conclusion, the record indicates that the Commission simply ignored the anti-pooling clause as irrelevant to the Well permit. In rejecting the Opielas' complaint about the permit, the Commission cited its decisions upholding permits for allocation wells despite the absence of pooling authority in leases. In *Klotzman*, the Commission rejected its hearing examiners' recommendation that the permit be denied because of the lack of pooling authority under the leases being combined to form the developmental unit for the horizontal well. Texas R.R. Comm'n, *Application of EOG Resources, Inc. for its Klotzman Lease (Allocation), Well No. 1H(Status No. 744730), Eagleville (Eagleford-2) Field, Dewitt County, as an Allocation Well Drilled on Acreage Assigned from Two Leases*, Oil and Gas Docket No. 02-0278952 (Final Order issued Sept. 24, 2013) (*Klotzman*) at 1. The Commission concluded that the lessee had a good-faith claim to drill the Well essentially because an exception to spacing rules could be granted because the lessee had all of the working interest to the leases affected by the Well. *Id.* at 1-2. The Commission dismissed a similar challenge to another allocation well in *Monroe*, concluding that the issue was decided in *Klotzman*. Texas R.R. Comm'n, *Complaint of Monroe Properties, Inc., et al. that Devon Energy Production Co, L.P. Does Not Have a Good Faith Claim to Operate the N I Helped 120 (Allot) Lease, Well No. 6H, Phantom (Wolfcamp) Field, Ward County, Texas*, Oil and Gas Docket No. 08-0305330 (Order of Dismissal issued Dec. 18, 2017). The Commission's reliance on *Klotzman* indicates that it did not necessarily fail to consider the lease's pooling clause but that it found that the anti-pooling clause did not prevent Magnolia from showing a good-faith claim of the right to operate and drill the Well. Further, a lack of pooling authority alone does not prohibit drilling under a PSA.

The trial court erred by concluding that the Commission erred by failing to consider the lease's pooling clause in assessing the good faith of Magnolia's claim of a right to drill on the property.[8]

### 3. The Commission's authority to adjudicate the validity of leases

Magnolia contends that the trial court erred by holding that the "Commission erred in concluding it has no authority to review whether an applicant seeking a well permit has authority under a lease or other relevant title documents to drill the well." The PFD stated:

> The Commission does not adjudicate questions of title or right to possession, which are questions for the court system. A showing of a good faith claim does not require an applicant to prove title or a right of possession. It is sufficient for an applicant to make a reasonably satisfactory showing of a good faith claim.

(Footnotes omitted.) In their findings of fact and conclusions of law, the Commission found a good-faith claim of right to operate despite the possibility of a bona-fide lease dispute and found that lease disputes are beyond the jurisdiction of the Commission. This conforms to the Texas Supreme Court's holding that "[w]hen [the Commission] grants a permit to drill a well it does not undertake to adjudicate questions of title or rights of possession. These questions must be settled in the courts." *Magnolia*, 170 S.W.2d at 191. The Commission has no power to determine property rights. *Jones v. Killingsworth*, 403 S.W.2d 325, 328 (Tex. 1965). The Commission is similarly limited from adjudicating the validity of contractual agreements such as pooling agreements. *See Railroad Comm'n v. Rau*, 45 S.W.2d 413, 416 (Tex. Civ. App.—

---

[8] We note that whether Magnolia has breached the Opielas' lease, improperly taken their oil, or violated laws or regulations when producing oil from the Tract are questions separate from Magnolia's good-faith claim to operate the Well and may be properly the subject of a judicial suit like the one filed by the Opielas and currently pending in Karnes County. *See Opiela v. EnerVest Operating LLC*, No. 18-06-00153-CVK (81st Dist. Ct., Karnes County, Tex.).

Austin 1931, writ dism'd) (cited by *Kawasaki Motors Corp. USA v. Texas Motor Vehicle Comm'n*, 855 S.W.2d 792, 799 (Tex. App.—Austin 1993, no writ)). The Commission did not err by concluding that it had no power to adjudicate the applicant's rights under a lease or other relevant title documents, and the trial court erred to the extent it determined otherwise.

The Opielas assert that the Commission found in Findings 15-19 "that contractual authority is irrelevant to evaluating a good-faith claim and that the Commission has no jurisdiction to consider the contents of the lease." We do not find such a sweeping assertion of irrelevancy and lack of jurisdiction to "consider" the contents of the lease by the Commission in the cited findings, which are set out below; considering the contents of the lease is not the same as adjudicating rights under it. But even if the Commission entirely refused to look at the lease, the Opielas have not shown prejudice to their substantial rights. The Opielas' complaint that the Commission failed to consider the lease terms focuses on the anti-pooling clause. As we have concluded that the permit for horizontal drilling under a PSA is not pooling under Texas law, the anti-pooling clause was not implicated, and any refusal by the Commission to review that clause or the lease as a whole during its review of the good faith of Magnolia's claim of right to operate and drill did not prejudice the Opielas' substantial rights. The trial court erred by concluding otherwise.

### 4. The Commission's adoption of rules

The trial court held that the Commission erred in adopting rules for allocation and PSA wells without complying with the requirements of the APA and in applying those rules to issue a permit for the Well. The trial court did not specify which rules were erroneously

18

adopted. The parties narrowed the field somewhat in their briefing,[9] then narrowed the list further at oral argument to focus on rules not adopted through the APA, including forms.[10] The Opielas also complain of the adoption of the standard that an operator can obtain a permit for a PSA well by getting 65% of the interest holders to sign the PSA.

---

[9] In their briefing, the Opielas discussed Rules 5, 26, 40, 80, and 86. *See* 16 Tex. Admin. Code §§ 3.5, .26, .40, .80 .86. There is no dispute that any relevant version of these rules was adopted and amended pursuant to APA procedures and, more critically, that the two-year period for challenging the rulemaking process has passed. *See* Tex. Gov't Code § 2001.035(b). To the extent that the trial court's judgment addressed noncompliance with APA rulemaking procedures in the adoption of Rules 5, 26, 40, 80, and 86, it exceeded the scope of this permit complaint and was erroneous.

[10] The Opielas contend that, although Rule 80 was amended under the APA, forms adopted under its provisions are void because the Commission uses Rule 80 to amend forms without going through APA rulemaking procedures. *See* Tex. Gov't Code § 2001.035(a) (rule is voidable unless agency adopts it in substantial compliance with APA procedures). Amended Rule 80 provides: "Notice of any new or amended forms shall be issued by the Commission." 16 Tex. Admin. Code § 3.80(a) (effective in 2014 (39 Tex. Reg. 5148 (July 7, 2014)). When adopting the amendment to Rule 80, the Commission stated:

> The policy requires the Commission to promulgate, abolish or amend forms only upon the approval of a majority of Commissioners at a public meeting. . . . Where required by Texas law to promulgate, abolish, or amend a certain form through rulemaking procedures conducted under the Texas Administrative Procedure Act, the Commission will continue to do so. Otherwise, the Commission will consider staff's recommended form revisions in an open meeting. Staff will place the proposed form revisions on the Commission's website for public review and comment for a period of time proportionate to the subject and degree of change.

39 Tex. Reg. 5148. Appellants contend that the Commission's adoption of forms under the Rule 80(a) process substantially complies with the APA procedures. An amicus argues, however, that the amended Rule 80(a) is void because it purports to amend the APA itself by modifying rulemaking processes for forms and, among other arguments, that forms purporting to amend or replace a form created under APA rulemaking are void because the definition of rule "includes the amendment or repeal of a prior rule." *See* Tex. Gov't Code § 2001.003(6)(B).

Because resolution of these issues regarding Rule 80 would not alter our resolution of the appeal, we need not address them.

The parties extensively argued these rulemaking-related issues. But because resolution of these issues would not alter our resolution in the next section of the core issue in this case—whether Magnolia made a reasonable showing of a good-faith claim of the right to drill the horizontal PSA well into the Tract and was entitled to the permit—resolving them is not necessary to final disposition of the appeal. *See* Tex. R. App. P. 47.1.

**5.  The finding that Magnolia made a reasonably satisfactory showing of a good faith claim to operate the Well**

The trial court held that the Commission erred in finding that Magnolia showed a good-faith claim of right to drill the Well. Appellants contend that the Commission correctly granted the permit because Magnolia met the 65% threshold for agreement of the mineral and working interest holders on each tract. The Commission's findings of fact included the following:

> 7.  For a PSA, the operator certifies to the Commission that at least 65% of the mineral and working interest owners from each tract have signed an agreement as to how proceeds will be divided.

> 8.  Regarding the Person Tract, 65.625% of the mineral interest owners signed either a PSA, consent to pool or ratification of unit, all setting forth a method of dividing proceeds.

> . . . .

> 12.  According to the instructions for Form P-16 *Acreage Designation*, which is a form filed when applying for a drilling permit, the term PSA is defined as follows:

>> **<u>PSA</u> (PRODUCTION SHARING AGREEMENT WELLBORE):** For purposes of this document, a horizontal wellbore crossing two or more tracts/leases and for which the operator certifies that at least 65% of the MINERAL and WORKING interest owners from each tract within the developmental unit have signed an agreement as to how proceeds will be divided. The wellbore need not be perforated within each tract of the developmental unit.

20

13. All of the written agreements relied on by Magnolia as PSAs contain an agreement as to how proceeds will be divided.

14. Magnolia has PSAs with at least 65% of all mineral interest owners and working interest owners for each of the tracts traversed by the Well.

15. The Commission has previously determined that written oil and gas leases covering the tracts the well traverses are a reasonably satisfactory showing of a good faith claim to operate an allocation well. It follows that written agreements with 65% of all mineral interest owners and all working interest owners for each tract the well produces from is sufficient to get a permit to operate a well, in this case a PSA well.

16. Magnolia has a good faith claim to operate the Well.

17. Complainants claim that their contractual lease covering the Person Tract does not contain pooling authority and Complainants have not signed a PSA such that Magnolia does not have a right to drill the Well. Complainant also claims that some of the documents relied on by Magnolia are not PSAs and some of the mineral interest owners of the Person Tract who did sign agreements did not have authority.

18. While Complainants may have a bona fide lease dispute as to whether Magnolia has a right to operate, that is insufficient to defeat Magnolia's good faith claim.

19. While the Complainants may have a bona fide lease dispute with Magnolia, the determination of whether there has been a breach and the appropriate remedy is outside the jurisdiction of the Commission.

PFD at 16-17. The Commission also adopted the conclusion of law that "Respondent provided a reasonably satisfactory showing of a good faith claim to operate the Well." *See* Tex. Admin. Code § 3.15(a)(5).

The Commission's conclusion that Magnolia made the requisite showing of a good-faith claim plainly rests on satisfaction of the 65% threshold of agreement to the PSA that is not found in the Texas Administrative Code. If, as the Opielas contend, the 65% threshold is an improperly adopted rule, then the Order is founded on an error of law and must be reversed.

21

If, as Appellants contend, the 65% threshold as articulated by the Commission in 2008 is a properly created standard, we conclude that the Order is not supported by substantial evidence.

The Commission did not in its Order, including the findings and conclusions, cite a source for the origin of the 65% threshold to demonstrate a good-faith claim to operate the Well and entitlement to a permit to operate the Well.[11] In their briefing, the parties trace the formalization of that authority to the 2008 minute entry in which two of the three Commissioners approved a permit while "directing staff that wells that are permitted based on a production sharing agreement should be approved when the usual criteria are met and the operator certifies that at least 65% of the working and royalty interest owners in each component tract have signed *the production sharing agreement*."[12] (Emphasis added.) The Commission's 2008 pronouncement did not assert that multiple different PSAs could be signed or that other documents could be the equivalent of a PSA for purposes of reaching the 65% threshold. Here, the Commission found that Magnolia represented that at least 65% of mineral interest owners had signed "an agreement as to how proceeds will be divided," which on the Tract included "*either* a PSA, consent to pool, or ratification of unit." The evidence shows that only 15.625% of the interest owners on the Tract signed a PSA; the remaining nearly 50% signed some other document. Substantial evidence does not support a finding that 65% of the interest owners "signed the production sharing agreement."

---

[11] As discussed below in greater depth, the definition cited in Finding 12 tracks the instructions to Form P-16 as revised in February 2019 and finalized in June 2019—after the application, permit, complaint, and hearing in this case. *See* PFD at 5 n.7, 16.

[12] Texas R.R. Comm'n, Formal Comm'n Actions, Hearings Div., p. 3, Status #665639 (Sept. 9, 2008) (available at https://web.archive.org/web/20161222204413/https://www.rrc.texas.gov/media/9027/090908.pdf).

Recognizing that a PSA and other documents could be functional equivalents, we will examine further. The Commission's Findings 7 and 15 describe a broader scope of agreements as demonstrating that a PSA exists to include "an agreement" or a "written agreement." The Commission found that 65.625% of the interest owners had signed "written agreements" with Magnolia, including consents to pool. An exhibit in the administrative record details that, of the interest owners on the Tract, 15.625% signed a PSA, 0.563% signed a ratification of designation of unit, and 49.437% signed a consent to pool. But the Commission does not require pooling to permit a PSA well and, as we have concluded, PSAs are not the same as pooling because the property interests involved and production divisions are not the same. Consequently, even while granting due deference to the Commission's expertise in regulating this complex industry, *see SWEPI L.P.*, 103 S.W.3d at 587, we are not persuaded that signing a consent to pool can substitute for signing a PSA absent a good-faith showing that the consents to pool and the PSA call for the same sharing of production for the horizontal well across tracts that are not pooled. Magnolia did not certify and the Commission did not make such a finding in this record, nor is there any indication in the application that pooling of the three tracts occurred.[13] Even if we

---

[13] Examining the terms of the agreements could expand the scope of the Commission's inquiry into reviewing the parties' agreements and, therefore, could exceed the normal scope of inquiry in which the Commission engages at the permitting stage. Indeed, Clark testified that he does not "think that the Commission ever sees a sharing agreement or a pooling unless it's represented to be a pooled unit."

We note, however, that the consents to pool for persons listed as owners of the Tract do not all call for the same division of production as the PSAs. For example, the consent to pool signed by William J. O'Brien III states:

> The production on which Owners'[] royalty is calculated shall be that proportion of the total unit production which the net acreage of the Property included in the unit bears to the total surface acreage in the unit, but only to the extent such proportion of unit production is sold by Lessee.

By contrast, a PSA signed for Peggy Person states:

consider the 65% threshold from the Commission's 2008 directive a properly adopted rule or decisional precedent, the record does not contain substantial evidence that Magnolia satisfied that rule by certifying that 65% of the interest owners have signed the PSA, undermining Finding 14.[14]

The Commission's Finding 12 quotes the definition of a PSA from Form P-16 as allowing proof of a PSA to include certification that 65% of interest owners have signed "an agreement as to how proceeds will be divided." But this quotation tracks the 2019 instructions for Form P-16, while the permit contested here was granted based on applications filed in May and August 2018—applications that predate use of the definition of PSA in the Form P-16 instructions as revised in February 2019 and June 2019 or Form P-16 as revised in June 2019.[15] The hearing

_____

The proportionate share of production allocated to each Sharing Well Property will be calculated by a fraction which has as its denominator the Completed Lateral Length of the Sharing Well and which has as its numerator the distance (in feet) that the Completed Lateral Length lies within the Sharing Well Property.

[14] As noted above, if the 65% threshold is not a properly adopted rule, the Commission's Order would fail to satisfy the substantial-evidence standard because the Order would be founded on an error of law and arbitrary. *See* Tex. Gov't Code § 2001.174(2).

[15] This definition appears in the instructions for the 2019 version of Form P-16. *See* PFD at 4 n.5; *see also See* Texas R.R. Comm'n 2019 Form P-16 Instructions (available at https://static1.squarespace.com/static/60a1390c3f87204622d78356/t/60a44ce659676b700c0e40b3/1621380326686/p-16-instructions-drilling-permits.pdf); 2019 Form P-16 (available at https://static1.squarespace.com/static/60a1390c3f87204622d78356/t/60a44cc8c37bbe66f9284b6d/1621380296941/p-16p-final.pdf) (revised 6/2019).
In Magnolia's reply in support of its motion to dismiss the Opielas' complaint about the permit, filed December 7, 2018, Magnolia states that Form P-16 was "last revised January 2016." Neither the 2016 version of Form P-16 nor its instructions defined a PSA well. *See* Texas R.R. Comm'n 2016 Form P-16 for Acreage Designation (available at https://web.archive.org/web/20160804030249/http://www.rrc.texas.gov/media/31924/p-16p-final.pdf); see *also* Texas R.R. Comm'n 2016 Form P-16 Instructions (available at https://web.archive.org/web/20160804030249/http://www.rrc.texas.gov/media/31920/p-16-instructions-final.pdf).

24

on the complaint about the permit concluded in January 2019. Even assuming that the 2019 revisions to the instructions for Form P-16 were properly adopted, they do not control review of the application and permit at issue here. Regardless of whether the 2016 version of Form P-16 was properly adopted, neither that form nor the instructions used to complete the applications here contained the expanded definition of the agreements that would meet the 65% threshold. Substantial evidence does not support a finding or conclusion that Magnolia showed a good-faith claim to operate a PSA well based on a certification that at least 65% of the working and royalty interest owners in each component tract have signed the PSA as required by the 2008 Commission directive. The trial court did not err by finding the Commission erred by concluding otherwise.

## 6. Allocation well alternative

Magnolia invites us in the alternative to render judgment granting the permit as an allocation well. Though witness Clark opined at the hearing that Magnolia would have been entitled to an allocation-well permit, we do not find reverting to the previously obtained and challenged permit and rendering judgment that the allocation-well permit be issued to be among the dispositions available because the Order before us does not pertain to an allocation well permit. *See* Tex. Gov't Code § 2001.174. In the alternative, Magnolia requests that we remand

---

Without determining whether the forms and instructions are rules, we note that a substantive rule will be applied only prospectively unless it appears by fair implication from the language used that it was the intent of the legislature (or agency) to make it applicable to both past and future transactions. *Pantera Energy Co. v. Railroad Comm'n*, 150 S.W.3d 466, 473–74 (Tex. App.—Austin 2004, no pet.). Because the permit at issue in this case was granted and the Opielas' complaint about it denied based on an application completed in 2018, the 2019 revisions of the forms and their status as any sort of rule do not control our review of the Commission's 2019 decision and we need not consider whether the 2019 (or later) revisions to Form P-16 and related instructions are improperly adopted rules. *See* Tex. R. App. P. 47.1.

to the Commission to consider whether the Well may be permitted as an allocation well. We will remand for further proceedings, the content and nature of which will be determined by the parties, the Commission, and the relevant law and rules.

## CONCLUSION

We reverse the parts of the trial court's judgment in which it determined (1) that the Commission erred in concluding it has no authority to review whether an applicant seeking a well permit has authority under a lease or other relevant title documents to drill the Well, and (2) that the Commission erred in failing to consider the pooling clause of the lease covered by the Well in deciding that Magnolia has a good-faith claim to operate the Well. We affirm the parts of the trial court's judgment in which it determined that the Commission erred in finding that Magnolia showed a good-faith claim of right to drill the Well and that this cause should be remanded.

We reverse the Commission's Order and remand this cause to the Commission for further proceedings.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith
  Dissenting Opinion by Justice Kelly

Affirmed in Part, Reversed in Part and Remanded

Filed: June 30, 2023

26